**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Kendal Chambers and Lana Chambers, individually, and as Natural Parents and Next Friends of Elliott Chambers, a minor,

Plaintiffs,

v.

Dana Babbitt, and Independent School District No. 833, South Washington County,

Defendants.

Civil Case No. 01-569 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Stephen M. Crampton, Esq., AFA Center for Law & Policy, 100 Parkgate Drive, Suite 2B, Tupelo, Mississippi 38801, appeared on behalf of Plaintiffs.

Robert Brownson, Esq., Louise A. Behrendt, Esq., Leo Brisbois, Esq., Stich, Angell, Kreidler, Brownson & Ballou, 250 Second Avenue South, Suite 120, Minneapolis, Minnesota 55401, and Mark Porter, Esq., In-House Counsel for Woodbury High School, appeared on behalf of Defendants.

---

## Introduction

The above-entitled matter came before the undersigned United States District Judge on May 15, 2001, pursuant to Plaintiffs' Motion for Preliminary Injunction. Plaintiffs action is a civil rights action brought under 42 U.S.C. § 1983, seeking relief for the alleged violation of Plaintiffs' First Amendment rights. Plaintiffs are the parents of a high school student whose school principal prevented him from wearing a sweatshirt emblazoned with the message, "Straight Pride." By their current motion for a preliminary injunction, Plaintiffs seek relief from the Court such that Elliott Chambers may wear his sweatshirt to school. For the reasons stated below, Plaintiffs' motion is granted in part consistent with the provisions of this opinion.

FILED MAY 18 2001
FRANCIS E. DOSAL CLERK
JUDGMENT ENTD
DEPUTY CLERK

## Background

Elliott Chambers is a student at Woodbury High School in Woodbury, Minnesota. On January 16, 2001, Elliott wore a sweatshirt to school that was emblazoned with the message "Straight Pride." On the back of the sweatshirt is a symbol of a man and a woman holding hands. That same day, a student named Travis alerted the assistant principal, Jill Moes, to Elliott's shirt and indicated that he did so on behalf of a group of students who were upset by it. Ms. Moes met with Elliott, told him of the students' response, and informed him that it was best that he not wear the shirt again. Ms. Moes states that Elliott told her he thought it unfair that there were such events as "gay pride parades" when there were no "straight pride parades." She also states that he indicated his parents would be contacting her about the shirt and "other issues as well."

On January 17, 2001, Principal Dana Babbitt met with Elliott and told him that he could not wear the shirt again in light of the offense taken by other students and the Principal's safety concerns for Elliott and other Woodbury students.

Woodbury High School falls within Independent School District 833 ("ISD 833"), and is subject to the district's policies. As an individual member, however, Woodbury High School can generate its own procedures by which it implements ISD 833 policies. The dress code policy at Woodbury High School states that:

> **DRESS GUIDELINES**
>
> Students may not wear items with **unacceptable writing or graphic depictions** which offend anyone or distract from the educational experience of students at Woodbury High School. Unacceptable writing or graphic depictions are those which are commonly accepted as vulgar, obscene, or socially demeaning or derogatory. Clothing which displays weapons or portrays death will not be allowed. Clothing or jewelry items which advocate use, misuse, or abuse of

> controlled substances and/or alcohol are also not acceptable. This would include advertising and trademarks for alcohol, tobacco, and related companies, as to the promotion of any activities that are illegal for students, such as gambling or gang affiliations.

The corresponding school district policy which Woodbury's guideline is intended to implement states in relevant part:

> II. School Board Rules for Student Conduct
>
> Disciplinary action shall be taken against a student for any behavior which is disruptive or which violates the rights of others. The following are examples of unacceptable behavior subject to disciplinary action by the school district:
>
> * * *
>
> 17. Student attire and personal grooming which creates a danger to health or safety or creates a disruption to the educational process.

Both ISD 833 Policies and Woodbury High School's regulations and procedures are distributed each school year to all students in the form of the District's booklet entitled "Summary of Student Discipline, Rights and Responsibilities" and the school's "Navigator Student Guide."

The events preceding Principal Babbitt's decision on January 17, 2001, are generally agreed upon by the parties, however, the exact timing and the specific nature of some of those events remains in dispute. On two occasions in December 2000, Elliott maintains that he wore a t-shirt with the same "Straight Pride" message without consequence. However, he also alleges that sometime during December 2000, a student, "Rachel," informed Elliott that she was offended by his shirt. On the other hand, Principal Babbitt maintains that, to his knowledge, the exchange between Rachel and Elliott took place on January 16, 2001.

On either January 8 or January 15, 2001, a Jesus and Me ("JAM") meeting, a student-initiated Christian group, took place at Woodbury High School. During the meeting, Elliott,

Travis, and other students participated in a heated discussion about Christianity and homosexuality. Elliott and other students cited biblical passages for the proposition that homosexuality is a sin, while Travis argued that Jesus' teachings confirm otherwise. Principal Babbitt maintains that he was informed that "gay-bashing" occurred at the JAM meeting at issue. The record before the Court suggests that the school conducted no investigation of these allegations.

Sometime during the 2000-2001 school year, a student's car was keyed and urinated upon, and the school believes that this occurred because the student was perceived to be homosexual. The student was permitted to park his car close to the school building to prevent such vandalism in the future.

On November 22, 2000, a white Woodbury High School student wore a bandana bearing the confederate flag. Upon seeing the bandana, an African-American student spat upon the white student, and a physical fight ensued. During the fight, the African-American student fell, hitting his head and triggering a severe epileptic seizure. The student was hospitalized. Two other fights occurred on November 22, 2000.

Fourteen physical fights, eleven in addition to those occurring on November 22, occurred during the 2000-2001 school year up to January 16, 2001. The record does not disclose the exact timing or the circumstances of any of the other eleven fights.

Woodbury High School displays two posters intended to promote tolerance of diversity. The posters present five areas of social diversity each identified by a particular symbol: (1) sexuality/inverted pink triangle; (2) disability/looped ribbon; (3) race/facial profiles in various colors; (4) religion/star of David, (5) gender/international symbols for man and woman

joined by "equal" sign. In addition, the school has organized a list of "safe staff" members, teachers who have volunteered to be identified as people open to discussion about issues of sexuality and as sources of information regarding community resources on issues of sexuality. "Safe staff" lists are posted around the school, particularly in the classrooms of "safe staff" members, and display an inverted pink triangle.[1]

While the Plaintiffs' lawsuit raises challenges to several policies of Woodbury High School and ISD 833, the scope of the request for preliminary injunction is more narrow. The Plaintiffs' current motion for preliminary injunction requests that the Court declare Principal Babbitt's January 17, 2001, decision unconstitutional in violation of Elliott's First Amendment right to express his religious beliefs and that the Court impose injunctive relief so that Elliott may wear his shirt to school.

**Discussion**

**1. Standard of Review**

Under Eighth Circuit precedent, a preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest favors the movant; and (4) that the movant

---

[1] In a memo to staff regarding the "safe staff" initiative, the inverted pink triangle is explained as "a positive symbol" of "identity" for "the gay community" that has been transformed from the "days of the Holocaust" when it was used by the Nazis to identify gays and lesbians. "It means that the person or space hosting the symbol is offering respectful support for glbt [Gay, Lesbian, Bisexual, and Transgender] people."

As of April 16, 2001, the school has revised its "safe staff" list to include all of the symbols displayed on the tolerance posters and to clarify that the members are "willing to listen to [students] and have information to help [students] with issues regarding race, sexual orientation, religion, disabilities or gender." The list if prefaced with the statement: "One goal of our school is to have a safe and respectful environment for <u>ALL</u> students."

will suffer irreparable harm absent the restraining order. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Publishing Co. v. Mead Data Central, Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986), *cert. denied*, 479 U.S. 1070 (1987). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**2. Likelihood of Success on the Merits**

Courts have historically recognized the tension between a public school's responsibility to maintain a safe environment conducive to learning and its equally compelling mandate to allow for the exercise of constitutional expression. In *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, the Supreme Court declared that high school students do not "shed their constitutional rights to freedom of speech at the school house gate." 393 U.S. 503, 506 (1969). The Court went on to hold, however, that such rights are not absolute in the secondary school context and must be "applied in light of the special circumstances of the school environment." *Id.* Under *Tinker*, a school may prohibit otherwise constitutionally protected expression if there is a reasonable belief that such expression could "materially and substantially interfere with the work of the school or impinge on the rights of other students." *Id.* at 509. A reasonable belief must be substantiated by facts that "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id.* at 514. In contrast, an "undifferentiated fear or apprehension of a disturbance is not enough to overcome a student's right to freedom of expression." *Id.* at 508.

While the facts available to Principal Babbitt on January 17, 2001, remain somewhat in dispute, the Court is able to conclude that Plaintiffs have demonstrated a strong likelihood of success in establishing that Principal Babbitt's decision was unreasonable. The facts relating to the November 22, 2000, incident are those upon which Principal Babbitt maintains to have relied the most. Such an incident undoubtedly impacts a school community dramatically, potentially making school staff and administration intensely sensitive to a seemingly volatile school environment. Nonetheless, other than the involvement of articles of clothing, little evidence has been presented to explain the nexus between a racial incident and the threat of a disruption relating to issues of sexuality. Moreover, the eleven other fights during the school year remain unexplained with respect to timing and nature, leaving the Court with little evidence that a disruption in this case was reasonably predicted.

With respect to the facts that relate more directly to issues of sexuality, the Court has been presented with sparse explanation of their indication of disruption, other than that students were "taking sides." The school does not appear to have responded to the allegations of "gay-bashing" at the JAM meeting, other than by prohibiting Elliott's shirt. If in fact the JAM meeting took place on January 15, 2001, the immediacy of the contentious meeting and Elliott's wearing of the shirt would seem to provide more support to Principal Babbitt's decision; however, resolution of the dispute on this issue is not likely to be determinative. Likewise, the Court has been presented no information on the timing of the car vandalism and any school response other than permitting parking near the building. While none of these facts would be independently determinative, their collective remoteness or even absence leads the Court to

conclude that the connection between Elliott's shirt and Principal Babbitt's response appears to be unconstitutionally tentative.

**3. Irreparable Harm and Public Interest**

In the context of free speech, the loss of First Amendment rights, even for a short amount of time, is presumed to constitute irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In the instant case, Elliott has been prohibited from wearing his shirt to school for over three months and, without injunctive relief, his rights would continue to be compromised for the remaining three weeks of the school year. The public has an unequivocal interest in the protection of First Amendment freedoms for all its members.

**4. Balance of Harms**

In contrast to the compromise of a student's constitutional rights, the Court must evaluate the potential harm to the Defendants. Defendants propose that injunctive relief in Plaintiffs' favor would result in Elliott wearing the shirt to school and inevitable disruption. In support of this proposition, Defendants point to evidence of disruption after the enforcement of Principal Babbitt's decision, *e.g.*, threatening phone calls, hate mail, and religious protests. It is not established whether such disruptive activity was targeted at Principal Babbitt's decision and/or the message on Elliott's shirt. While very likely, it is also not established that Elliott will wear the shirt again. Viewing these factors in conjunction with its evaluation of Plaintiffs' likelihood of success on the merits, the Court does not find that the balance tips decidedly in favor of Defendants.

That said, however, the Court's decision to grant injunctive relief serves to reinstate the *status quo* as of January 16, 2001, which is that a student's freedom of expression is protected in

the school environment to the extent that a school does not otherwise have a reasonable belief that such expression could lead to substantial disruption of the school environment or material interference with school activities. The school is not left without authority to quell otherwise constitutionally protected speech when the *Tinker* threshold is established. However, to the extent that the environment remains as it was on January 17, 2001, and to the extent that the facts before the Court represent that environment, then the Court cannot make a finding that the requisite threshold was met.

**Conclusion**

The teenage years are a time of discovery as all of our youth assert their individuality and sexuality. Those students who identify themselves as gay, lesbian, bisexual, or transgender ("GLBT"), however, struggle with the added pressures of potential alienation from friends, family, and community, and the potential for ridicule or even violence. Indeed, studies show that more than ninety percent of high school students hear negative comments regarding homosexuality during the school day. It is no wonder that there are significantly higher reports of depression and suicide amongst our GLBT youth, a problem that cannot be ignored.

The Court rejects Plaintiffs' arguments that the school is in any way promoting homosexuality. By displaying posters and lists of staff members who are willing to talk about issues of sexuality and now race, disability, gender, and religion, the school has made a conscious and commendable effort at creating an environment of tolerance and respect for diversity. The use of symbols such as the inverted pink triangle is widespread. Adopting a symbol commonly associated with a minority group in the name of tolerance of diversity for all groups acts as a powerful reminder of the targeted *intolerance* with which our society struggles.

Our schools, like our communities at large, are invaluably improved by the diversity of their members. All students benefit from the respectful and thoughtful exchange of ideas and sharing of beliefs and practices. Schools, in particular, are vital environments that can provide an education of both the substance of diversity and the responsible manner with which such diversity is approached and expressed. It is incumbent upon the school, the parents, the students, and the community of Woodbury to work together so that divergent viewpoints, whether they be political, religious, or social, may be expressed in a civilized and respectful manner.

Maintaining a school community of tolerance includes the tolerance of such viewpoints as expressed by "Straight Pride." While the sentiment behind the "Straight Pride" message appears to be one of intolerance, the responsibility remains with the school and its community to maintain an environment open to diversity and to educate and support its students as they confront ideas different from their own. The Court does not disregard the laudable intention of Principal Babbitt to create a positive social and learning environment by his decision, however, the constitutional implications and the difficult but rewarding educational opportunity created by such diversity of view point are equally as important and must prevail under the circumstances.

Finally, it is difficult for this Court to understand why all parties to this lawsuit and the members of the Woodbury community, including its parents, schools, student councils, and community leaders, have relinquished their responsibility to a federal court to create parameters of behavior for its schools and its youth. As the Court stated during the hearing on May 15, 2001, quite apart from how the Court rules on the First Amendment issue, which arguably is the easiest issue with which Woodbury High School and its citizens of Woodbury have to deal, it will always remain the privilege and responsibility of the parents and citizens of Woodbury to

raise and nurture its children into decent and caring human beings who treat people with dignity, respect, kindness, and equality. Messages of hatred, bias, and intolerance should not be a part of any child's upbringing. The great men and women who have brought this country to where it is, while having a vision of the constitutional vigilance that must be maintained to preserve a civilized and democratic society, have always valued, first and foremost, kindness and compassion and a keen understanding that all people are considered equal under the law regardless of their race, religion, culture, sexual orientation, or gender.

Students at Woodbury High School, and in every school in this country, deserve a safe, secure, and robust learning environment, free from disruption and violence. The Court would suggest that it is now the responsibility of the parties and all members of the Woodbury community to resolve these issues within their community, rather than the Court, if the best interests of all students and children in Woodbury are to be served. Perhaps then, something truly good could result from the unfortunate circumstances surrounding some of the events that led to this case. The students of Woodbury High School deserve no less.

For the reasons stated, **IT IS HEREBY ORDERED** THAT:

1. Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 2) is **GRANTED IN PART** consistent with the provisions of this opinion and such that:

    a. To the extent that Principal Babbitt's January 17, 2001, decision was based on the tendency of the "Straight Pride" message to offend others, then the prohibition of the "Straight Pride" shirt was unconstitutional.

    b. The Court declines to declare that there is no set of circumstances where the "Straight Pride" shirt can be prohibited, albeit temporarily until the

circumstances change, without resulting in the violation of the First Amendment. Likewise, however, the Court cannot declare that a permanent ban on the shirt can be issued given the ever-changing environment of our schools and the application of circumstance as required under *Tinker*. If Principal Babbitt's January 17, 2001, decision had been based on a reasonable belief that "substantial disruption of or material interference with school activities" would ensue from the "Straight Pride" shirt or any other clothing or accessory with a message pertaining to issues of sexuality, then the action would have been constitutional.

c. The facts currently before the Court do not support a finding that the January 17, 2001, decision was based on a reasonable belief that "substantial disruption of or material interference with school activities" would ensue.

d. The *status quo* of January 16, 2001, is reinstated such that a student's freedom of expression is protected in the school environment to the extent that a school does not otherwise have a reasonable belief that such expression could lead to substantial disruption of the school environment or material interference with school activities.

Dated: May 17, 2001

DONOVAN W. FRANK
Judge of United States District Court